Kenneth E. CARTER, Appellant,

v.

W. S. SNYDER et al., Appellees.

Court of Appeals of Kentucky.

Nov. 20, 1959.

Elwood Rosenbaum, Lexington, for appellant.

Marion Rider, Frankfort, for appellees.

BIRD, Judge.

W. S. Snyder and Grace Snyder owned a bulldozer. While being operated by Kenneth E. Carter the machine was stalled in the mud. He was unable to release it and started home. He met W. S. Snyder. They went back to the machine. W. S. Snyder took over its operation while Kenneth E. Carter remained on the ground to assist in moving it from its stalled position. Carter was injured during this operation. He sues to recover damages for his injury which he charges to the negligence of W. S. Snyder in operation of the bulldozer. Appropriate responsive pleadings were filed. Snyder and Carter gave their depositions. The Snyders then moved for a summary judgment under CR 56.03. The motion was sustained and the complaint dismissed. The plaintiff appeals.

He insists that there was and is an issue of a material fact and that the court is in error. The appellant, Carter, explains in

his brief the method used to move the machine and we quote:

"The other hired hand on the farm came to assist and he hauled rocks in a truck to the bulldozer. In the meantime, Dr. Snyder had parked his car so that the car lights permitted him to see Appellant at all times.

"Dr. Snyder while operating the bulldozer blade would lower it to the ground and force the tracks of the bulldozer to raise themselves slightly out of the mud. Appellant would then step between the blade and the radiator of the bulldozer and throw rocks underneath the caterpillar treads. He would then step on top of the blade and signal Dr. Snyder to raise the blade. The tracks would then settle down on the rocks and the blade would then be lowered thereby again raising the tracks and the process of putting rocks underneath would be repeated until sufficient rocks had been thrown underneath the tracks to permit the bulldozer to be moved."

It was during one of these raising and lowering operations that Carter was injured. He explains the manner in which he was injured in the following testimony:

"Q. 400 Now you told the Doctor to raise the blade. Where were you when you told him to raise the blade? A. I was standing on it.

"Q. 401 You were standing up on the blade? A. Yes, Sir.

"Q. 402 And did he raise the blade? A. Yes, Sir.

"Q. 403 Well then what happened? A. My feet, I was in mud to my knees and my feet slipped off.

"Q. 404 Your feet slipped off the blade? A. Yes, Sir.

"Q. 405 And where did you fall, Mr. Carter? A. Between the radiator and the blade.

"Q. 409 How did you get hurt. Did it catch you some way? A. Yes, Sir.

"Q. 410 What caught you? A. The blade and the radiator come on up between the blade and the radiator.

"Q. 411 And as the blade continued on up it caught you between that and the radiator? A. Yes, Sir."

It is apparent from this evidence that Carter simply slipped off of the blade as it was rising. There is nothing in the testimony to show that he was caused to slip off of the blade by Snyder's negligence. Further, there is no doubt that plaintiff was guilty of negligence in riding the blade with his slick shoes and there is no doubt that plaintiff would not have been injured except for his own negligence.

However, it is earnestly insisted that Snyder failed to exercise due care to avoid the injury after plaintiff's own negligence had put him in a position of peril. This, says the appellant, is a material fact about which there is an issue and he contends that the case should go to the jury upon the "doctrine of last clear chance."

Let us now consider the testimony of Snyder:

"Q. 170 It wasn't? Well, now, how did he get hurt Dr. Snyder? A. When he fell off there he decided that he would get back up on the blade. So when he fell off he was facing me—when he slipped off he was still standing up, of course. He didn't fall down at all, he was still standing up. Then he turned around and put one knee up on the blade, and as he turned around—why he did it only God will ever know—but when he turned around that movement brought him between the radiator of the tractor and the blade. And then—of course, if he had just stood still there there is no way in the world that could have hurt him, because there is plenty of space there for a man to stand in.

**384**

"Q. 171 Did you see him in there? A. I saw him around—in that position, yes, sir.

"Q. 172 And you continued raising the blade? A. The blade continued to rise, because if he had wanted me to stop all he had to do was to holler and I could have stopped.

"Q. 173 You could have heard him if he had hollered? A. Absolutely. I had been talking to him all the time.

"Q. 174 And the noise of the dozer didn't interfere with it? A. No, not if he had hollered. We talked back and forth all night."

Though it was dark this evidence clearly shows that Snyder saw Carter slip off of the blade and there can be no doubt that Snyder saw Carter's position. Yet one thing is lacking. There is nothing in this record to show that a perilous position was revealed to Snyder. From what Snyder saw of Carter, Carter could have been perfectly safe in his position. The only way for Snyder to have discovered Carter's peril was to look at him or be told by Carter. The proof clearly shows that he did look, that he did see Carter, and that he didn't see or know of his peril. The evidence further shows by Carter's own testimony that he did nothing to put Snyder on notice of his perilous position. Snyder also testified to this.

When one has exhausted his only means of discovering another's peril and that peril is still not made manifest the doctrine of last clear chance will not apply. The peril must be reasonably obvious. In Jordon v. Clough, Ky., 313 S.W.2d 581, 584, we said:

"Finally, appellant maintains that, conceding she was guilty of contributory negligence, even so, appellee could have avoided the harmful consequences visited upon her after he became aware of her dangerous plight. She relies upon what is known as the doctrine of discovered peril, or the legal concept of 'last clear chance.' In Swift & Co. v. Thompson's Adm'r, 308 Ky. 529, 214 S.W.2d 758, 760, in discussing the basis for invoking this principle, we said:

" 'In applying the rule, we have consistently recognized that the defendant must, as a matter of fact, have the last clear chance. It is not a speculative chance or a possible chance. In each case there must be proven facts which justify the conclusion that the plaintiff's peril should have been discovered. *Such peril must be reasonably obvious.*' " (Emphasis ours.)

See also Johnson v. Hunt, D.C., 122 F.Supp. 816, at page 820. Even Carter's own testimony shows that his peril was not obvious.

It is apparent to this Court that the testimony of the parties precludes an issue on the factual question of last clear chance. The court was correct in granting a summary judgment.

The judgment is affirmed.

WILLIAMS, J., not sitting.